IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **COUNTY OF COOK, a body politic and corporate of the state of Illinois,** ) ) ) **Plaintiff/Counter-Defendant,** ) ) **v.** ) ) **KELLOGG COMPANY, a Delaware corporation,** ) ) ) **Defendant/Counter-Plaintiff.** ) | 16 C 3399 Judge John Z. Lee |

## MEMORANDUM OPINION AND ORDER

In this diversity case, Cook County ("the County") has sued Kellogg Company ("Kellogg") under Illinois law for unjust enrichment, as well as for a declaratory judgment that the County is not obligated to provide free steam heat to Kellogg. Kellogg, in turn, has countersued the County for a declaratory judgment that the County is so obligated and for breach of a covenant running with the land. The County has moved for summary judgment on its claims. Kellogg has cross-moved for summary judgment as to the County's claims, as well as Kellogg's own declaratory judgment claim. For the reasons provided below, the County's motion is denied, and Kellogg's motion is granted. Because Kellogg has not moved for summary judgment on its breach-of-covenant counterclaim, it is the only claim that remains for trial.

### Facts[1]

Prior to December 27, 1973, the City of Chicago ("the City") owned a municipal heating plant. Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 1, ECF No. 94. On that date, the City and the County entered into an agreement entitled, "Contract for the Sale of a Municipal Heating Plant from the

---

[1] The following facts are undisputed unless otherwise noted.

City of Chicago to the County of Cook" ("1973 Agreement"). Pl.'s Ex. 1, 1973 Agreement at 10, ECF No. 88-1. The County Board of Commissioners approved the 1973 Agreement on December 20, 1973. *Id.*

At the time of the 1973 Agreement, seventy percent of the steam output manufactured by the heating plant was used by the County for its existing facilities, while the remaining thirty percent was used by the City. *Id.* at 2. The County, however, planned to build and rehabilitate additional facilities that would require significantly more steam heat. *Id.* at 1. To service these additional facilities, the plant needed to undergo the construction of an addition as well as other improvements. *Id.* Given this, the City and the County agreed that it would be better for the County to possess fee title to the plant, rather than the City. *Id.* at 4.

In pertinent part, the 1973 Agreement provides:

> 1. The City will sell certain real property as legally described in Exhibit "A", to the County and that the County shall in perpetuity, or so long as the City in its sole discretion may require, furnish steam heat for the property described in Exhibit "B" presently owned by the City. The City shall have the right to receive steam heat for the existing buildings, or any other building which may be constructed by the City within the complex described in Exhibit "B".
>
> 2. The City, its successors or assigns shall have the right to receive the same quantity of steam heat servicing the property located on Exhibit "B" from the County at no cost to the City for as long as the City in its discretion shall require.
>
> 3. The right of the City to receive steam heat from the Municipal Heating Plant shall be a "covenant running with the land" for the benefit of those properties delineated in Exhibit "B".

Def.'s LR 56.1(b)(3)(C) Stmt. ¶ 2.

One of the sixteen properties listed in Exhibit "B" is a building described as "WARE HOUSE." *Id.* ¶ 5; 1973 Agreement, Ex. B. The warehouse is located south of W. 31st Street and

west of Sacramento Avenue in Chicago, Illinois, on a parcel assigned PIN 16-36-100-056-0000 by the County Recorder ("Warehouse Property"). Def.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6–7.

From 1973 to 2015, the County provided steam heat to the Warehouse Property at no cost. *Id.* ¶ 29. During this time, various private entities owned, leased, or otherwise occupied the Warehouse Property. Pl.'s LR 56.1(a)(3) Stmt. ¶ 31, ECF No. 88. For example, the City subleased the Warehouse Property to Farley Candy Co. ("Farley") in 1992, and the sublease was recorded with the County Recorder. Def.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 9–10. At some point thereafter, the City conveyed the deed to the Warehouse Property to Farley, which was succeeded by Favorite Brands International, Inc. ("Favorite Brands"). *See id.* ¶ 11. Favorite Brands then conveyed the deed in the Warehouse Property to Nabisco, Inc., and the transfer was recorded with the County Recorder in 1999. *Id.* ¶¶ 12–13. Nabisco, Inc. then was succeeded in interest by Kraft Foods Global Inc. ("Kraft"). *Id.* ¶ 14.

Finally, in 2005, Kraft entered into an asset purchase agreement with Kellogg. And, as part of that transaction, Kraft conveyed its fee simple interest in the Warehouse Property to Keebler Company, a wholly owned subsidiary of Kellogg, by special warranty deed, which was recorded with the County Recorder in June 2005. *Id.* ¶¶ 15, 16.

Prior to purchasing the Warehouse Property, Kellogg learned, as part of its due-diligence inquiry, that the owner of the Warehouse Property is entitled to steam heat free of charge as in past practice with prior owners. *Id.* ¶ 17. Not surprisingly, this affected the purchase price. *Id.* ¶ 19.

To date, neither the City nor Kellogg has notified the County that steam heat is no longer required at the Warehouse Property. *Id.* ¶¶ 50–51. Nonetheless, the County ceased providing steam heat to Kellogg in 2015. *Id.* ¶ 53. On May 15, 2015, the County sent a letter demanding

3

payment of $2,116,800 for steam heat the County had provided Kellogg from 2005 to 2015. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 70–71.

## Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014). A district court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). "The judge must ask whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Insolia v. Phillip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## Analysis

I. **Whether the County Is Obligated Under a Covenant Running with the Land to Provide Free Steam Heat to Kellogg**

"A covenant is a contract to which the ordinary rules of contract construction apply." *Chiurato v. Dayton Estates Dam & Water Co.*, 82 N.E.3d 789, 797 (Ill. App. Ct. 2017). "In interpreting a covenant, the goal of the court is to give effect to the actual intent of the parties when the covenant was made." *Neufairfield Homeowners Ass'n v. Wagner*, 42 N.E.3d 941, 944 (Ill. App. Ct. 2015).

"Where the covenants are unambiguous and the intent of the parties can be determined by the covenants' explicit provisions, courts should effectuate that intent without relying on extrinsic aids." *Chiurato*, 82 N.E.3d at 797. Where the "operative part of the agreement is clear and free from ambiguity," its "clearly expressed stipulations cannot be controlled by but must prevail over the recitals." *Chi. Daily News v. Kohler*, 196 N.E. 445, 451 (Ill. 1935).

Under Illinois law, to determine whether a covenant runs with the land, "a court looks to whether: (1) the grantee and the grantor intended the covenant to run with the land; (2) the covenant touches and concerns the land; and (3) there is privity of estate between the party claiming the benefit and the party resting under the burden of the covenant." *Bank of Am., N.A. v. Cannonball LLC*, 12 N.E. 3d 841, 847–48 (Ill. App. Ct. 2014) (citing *Streams Sports Club, Ltd. v. Richmond*, 457 N.E.2d 1226, 1230 (Ill. 1983)).

The County apparently concedes the latter two elements and focuses solely on the first, arguing that the City and the County never intended a covenant for free steam to run with the land. The 1973 Agreement states, in pertinent part:

> 1. The City will sell certain real property as legally described in Exhibit "A", to the County and that the County shall in perpetuity, or so long as the City in its sole discretion may require, furnish steam heat for the property described in Exhibit "B" presently owned by the City. The City shall have the right to receive steam heat for the existing buildings, or any other building which may be constructed by the City within the complex described in Exhibit "B".
>
> 2. The City, its successors or assigns shall have the right to receive the same quantity of steam heat servicing the property located on Exhibit "B" from the County at no cost to the City for as long as the City in its discretion shall require.
>
> 3. The right of the City to receive steam heat from the Municipal Heating Plant shall be a "covenant running with the land" for the benefit of those properties delineated in Exhibit "B".
>
> \*\*\*

5

> 14. None of the provisions of the Agreement is intended to or shall be merged by reason of any deed transferring title to the Property from the City to the County or any successor in interest, and any such deed shall not be deemed to affect or impair the provisions and covenants of the Agreement.

1973 Agreement ¶¶ 1–3, 10, 14.

The County first asserts that, under paragraph 2, Kellogg is not the City's "successor" because the City was not acquired by, nor did it merge with, Kellogg. The County relies in part on a case in which an Illinois appellate court affirmed the trial court's grant of a motion to compel arbitration where the defendant corporation was deemed a successor due to its merger with a corporation that had signed the arbitration agreement. *See Robert A. Besner & Co. v. Lit Am., Inc.*, 574, N.E.2d 703, 704 (Ill. App. Ct. 1991). But *Besner* has limited value here, because it did not involve a municipal corporation or real property.

The County also relies on *Venner v. Chicago City Railway Co.*, 86 N.E. 266, 270 (Ill. 1908), to support its theory that the parties anticipated that another municipal corporation, rather than a private entity, might acquire the City and become its "successor." But *Venner* too is inapposite. First, the *Venner* court stated, in 1908, that the City was growing through annexation of surrounding villages and cities, not that it faced acquisition. Second, nowhere does *Venner* refer to any annexing entity as a "successor."

In the end, the Court is unpersuaded by the County's crabbed reading of the term "successor." In the context of a contract involving real property, such as the 1973 Agreement, the most natural reading of the term "successor" describes one to whom title to the property is conveyed. *See Kessler v. Palmeri*, 3278 N.E.2d 813, 815 (Ill. App. Ct. 1972). Because the City conveyed the deed to the Warehouse Property to Farley, and, after a series of owners, the deed was

6

ultimately conveyed to Kellogg, the Court holds that Kellogg is the City's "successor" to the Warehouse Property as that term appears in the 1973 Agreement.

Additionally, the County argues that paragraph 3, which states that the "right of the City to receive steam heat from the Municipal Heating Plant shall be a 'covenant running with the land' for the benefit of [the Warehouse Property,]" only obligates the County to provide steam heat to the building, not to provide it for free. But the intent of the parties "is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011). Rather, "[a] contract must be construed as a whole, viewing each provision in light of the other provisions." *Id.*

Given the immediately preceding paragraphs, the plain language of paragraph 3 indicates that the City had the right to convey the Warehouse Property to a successor and that the County's obligation to provide free steam heat to the City would inure to the successor's benefit. Otherwise, the parties would not have agreed that the County was required to furnish steam heat for the Warehouse Property "in perpetuity." *See* 1973 Agreement ¶ 1. And it is useful to contrast the County's obligation to provide steam heat "in perpetuity" with the parties' recognition that the impacted properties include those "presently owned" by the City. *Id.* If the parties had intended the County's obligation to end once the City's ownership ended, the word "presently" would not be necessary. *See Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 368 (Ill. 1998) ("Courts will generally avoid interpretations that render contract terms surplusage [.]"). Nor would the parties have agreed that "[t]he City, its successors or assigns shall have the right to receive the same quantity of steam heat servicing the property located on Exhibit 'B' from the County at no cost to the City for as long as the City in its discretion shall require." 1973 Agreement ¶ 2; *see Dorsey v. St. Louis, A. & T.H.R. Co.*, 58 Ill. 65, 67 (1871) ("A covenant is said to run with the land when

7

either the liability for its performance or the right to enforce it, passes to the assignee of the land itself.").[2]

The County also argues that the 1973 Agreement's liquidated-damages provision evinces the parties' intent that the County's obligation to provide free steam heat would cease after ten years. According to the County, at the ten-year mark, the City would have recouped the plant's value, $3,360,000, in free steam heat. Pl.'s Reply Br. at 13–14, ECF No. 95 (citing the 1973 Agreement). But this argument is belied by the unambiguous language in the 1973 Agreement, discussed above. What is more, it is inconsistent with the liquidated-damages provision itself. Paragraph 9 requires the County to pay to the City $3,360,000 in damages (less the aggregated value of the steam heat service as of the date of default) if the County defaults within ten years and requires the County to pay to the City "its actual damages, if any," thereafter. 1973 Agreement ¶ 9. If the parties had intended the County's obligation to expire after ten years, the parties would not have agreed to require the County to pay *any* damages after that period.[3]

For these reasons, the Court denies the County's motion for summary judgment and grants Kellogg's cross-motion as to its request for declaratory judgment.[4] The Court declares that the

---

[2] As Kellogg observes, noticeably absent from the 1973 Agreement is any language establishing the County's right to cease providing steam heat to the City's successor or assign in the event of nonpayment. The parties surely would have included such a provision had they intended that the City's successor or assign would have to pay for the steam heat.

[3] Furthermore, "[a]s a general principle of contract law, statutes and laws in existence at the time a contract is executed are considered part of the contract." *Braye v. Archer-Daniels-Midland Co.*, 676 N.E.2d 1295, 1303 (Ill. 1997). "It is presumed that parties contract with knowledge of the existing law." *Id.* It is thus presumed that the City and County were aware that, "[w]here a covenant runs with the land, the owner of the land at the time of its breach, whether an immediate or a remote grantee or assignee, may maintain an action for the breach in his own name against any or all of the covenantors." 14 Ill. L. & Prac. Covenants § 6 (1968).

[4] Because the County's unjust enrichment claim necessarily rises and falls with its declaratory judgment claim, the Court also denies the County's motion for summary judgment and grants Kellogg's cross-motion as to Count II of the County's amended complaint.

8

1973 Agreement obligates the County to provide to Kellogg the same quantity of steam heat that it had provided to the City during the City's ownership of the Warehouse Property free of charge, for as long as the City in its discretion shall require.

## II. Whether the County's Obligation to Provide Free Steam Heat to the City's Successors and Assigns under the 1973 Agreement Violates the Illinois Constitution

Next, the County argues that interpreting the 1973 Agreement to require it to provide free steam heat to Kellogg violates the Illinois Constitution, which provides that "[p]ublic funds, property or credit shall be used only for public purposes." Ill. Const., art. VIII, § 1(a). To establish a violation of this provision, a plaintiff must show "that governmental action has been taken which directly benefits a private interest without a corresponding public benefit." *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277, 293 (Ill. 2008). The "crucial test is whether the attempted use of the municipal [funds] subserves the public interest and benefits a private individual or corporation only incidentally. If the private benefits are purely incidental to the public purposes of the act, then art. VIII, section 1(a), of the Illinois Constitution is not violated." *O'Fallon Dev. Co. v. City of O'Fallon*, 356 N.E.2d 1293, 1299 (Ill. App. Ct. 1976).

In *Empress Casino*, the Illinois Supreme Court explained:

> This court has long recognized that what is for the public good and what are public purposes are questions which the legislature must in the first instance decide. In making this determination, the legislature is vested with a broad discretion, and the judgment of the legislature is to be accepted in the absence of a clear showing that the purported public purpose is but an evasion and that the purpose is, in fact, private. In the words of Justice Holmes, "a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect."

*Id.* at 294 (internal quotation marks and citations omitted). The Supreme Court continued:

> What is a 'public purpose' is not a static concept, but is flexible and capable of expansion to meet the changing conditions of a complex society. Moreover, the power of the State to expend public moneys

9

> for public purposes is not to be limited, alone, to the narrow lines of necessity, but the principles of wise statesmanship demand that those things which subserve the general wellbeing of society and the happiness and prosperity of the people shall meet the consideration of the legislative body of the State, though they ofttimes call for the expenditure of public money. The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving a public purpose.

*Id.* (internal quotation marks and citations omitted).

The County concedes that the 1973 Agreement served a public purpose because, through it, the City conveyed to the County title to a multi-million dollar plant that provided steam heat to the County's existing buildings. The conveyance also enabled the County to upgrade the plant to provide heat to additional buildings. This, in turn, aided the County in providing additional public services to its citizens. The public purpose was further served because the 1973 Agreement created an arrangement that saved the County from having to pay the City $3,360,000 from public coffers.

What is more, the Cook County Board of Commissioners, the legislative body of the County, reviewed the 1973 Agreement—including the requirement that the County would provide free steam heat to the City and its successors—and approved it. The Board's approval of the agreement deserves "at least great respect." *See id.*

Nonetheless, the County argues that the Illinois Constitution categorically prohibits the County from providing free steam heat to Kellogg, because the benefit to Kellogg is more than incidental to the public purpose of the 1973 Agreement. The County leans heavily on *O'Fallon*, 356 N.E.2d at 1299, and *Wilmot Mountain, Inc. v. Lake County Forest Preserve District*, 859 F. Supp. 2d 932, 936–37 (N.D. Ill. 2012). But, as Kellogg notes, *O'Fallon* and *Wilmot* involved a private entity's use of public land for a private purpose, whereas here Kellogg owns the land. *O'Fallon* is also distinguishable because the municipality in that case received nothing in return for the private benefit; by contrast, the County received title to a municipal heating plant in return

10

for its promise. *Compare* 356 N.E.2d at 1296 ("[N]o compensation has been paid to the city[.]"), *with* Def.'s LR 56.1(a)(3) ¶ 14 ("the City did, in fact, transfer all rights, title and interest in the Municipal Heating Plant to the County."). *Wilmot* is likewise distinguishable because the governmental action did not create a corresponding public benefit. *See* 859 F. Supp. 2d at 937.

The County also compares the appraised value of the municipal heating plant in 1973 dollars, $3,360,000, to the estimated $2,116,800 in steam heat it has provided to Kellogg from 2005 to 2015, arguing that this proves that the benefit to Kellogg is more than merely incidental to the benefit that the public gained under the agreement. *Compare* Pl.'s LR 56.1(a)(3) Stmt. ¶ 8, *with id.* ¶ 71. But these figures alone do nothing to advance the County's argument, and the County provides little else. For example, the County does not provide the appraised value of the municipal heating plant in today's dollars, as opposed to what it was worth in 1973. Nor does it provide a valuation of the plant that reflects the upgrades that were made possible by the 1973 Agreement. The County also has not compared the percentage of total steam heat output that was used by Kellogg versus the percentage utilized by the County from 2005 to 2015. This information would be helpful, because Exhibit B to the 1973 Agreement shows that the Warehouse Property was only one of sixteen City buildings to which the County was required to supply free steam heat. 1973 Agreement, Ex. B. Assuming that approximately the same amount of steam output was required to heat each building in 1973, the Warehouse Property would have used only one-sixteenth of the steam used by the City (which in turn was only thirty percent of the heating plant's total output at the time). Pl.'s LR 56.1(a)(3) Stmt. ¶ 9. Thus, under these conditions, the Warehouse Property would have received only 1.87% of the plant's total steam output.

Given that the County received title to the entire plant as part of the 1973 Agreement, the Count concludes that the County has not provided evidence from which a reasonable jury could

11

find that its obligation to provide steam heat free of charge to Kellogg is more than incidental to the public purpose served by the 1973 Agreement.

### III. Whether the 1973 Agreement Is Terminable at Will

The County's final argument is that the 1973 Agreement is terminable at will because it is a contract of indefinite duration. "Under Illinois law, perpetual contracts are disfavored, so the law presumes that such contracts are terminable at will by either party." *Burford v. Accounting Practice Sales, Inc.*, 786 F.3d 582, 586 (7th Cir. 2015) (citing *Jespersen v. Minn. Mining & Mfg. Co.*, 700 N.E.2d 1014, 1017 (Ill. 1998)). "This does not mean that Illinois law forbids parties from making contracts of indefinite duration; Illinois law merely disfavors them and assumes that most contracting parties do too." *Id.* This presumption "can be overcome if the parties clearly agree to place limits on when termination may take place." *Id.* "An agreement without a fixed duration but which provides that it is terminable only for cause or upon the occurrence of a specific event is in one sense of indefinite duration, but is nonetheless terminable only upon the occurrence of the specified event and not at will." *Jespersen*, 700 N.E.2d at 1016.

The 1973 Agreement provides, in pertinent part:

> The City has the option to require steam heat for the said facilities so long as it determines that the steam heat is necessary and desirable for the operation of the property described on Exhibit "B", and that in the event the City notifies the County that the City no longer requires the said steam heat, the County shall have no further obligation or liability under the terms of this Agreement.

1973 Agreement ¶ 10.

The 1973 Agreement lacks a fixed duration, but the presumption that it is terminable at will is rebutted by unambiguous language stating that "in the event the City notifies the County that the City no longer requires the said steam heat, the County shall have no further obligation or

liability under the terms of this Agreement." *Id.* Accordingly, the Court holds that the 1973 Agreement is not terminable at will and denies summary judgment to the County on this ground.

## Conclusion

For the reasons set forth above, the County's motion for summary judgment is denied, and Kellogg's motion for partial summary judgment is granted as to the parties' claims for declaratory judgment and as to the County's claim for unjust enrichment. The Court declares that the 1973 Agreement obligates the County to provide to Kellogg the same quantity of steam heat that it had provided to the City during the City's ownership of the Warehouse Property free of charge, for as long as the City in its discretion shall require. Kellogg's breach-of-covenant counterclaim remains for trial. The parties shall be prepared to set dates for the final pretrial conference and jury trial, as well as deadlines for the filing of the final pretrial order and motions *in limine* at the next status hearing on April 3, 2019, at 9:00 a.m.

**SO ORDERED**                           **ENTER: 3/19/19**

                                                   **JOHN Z. LEE**
                                                   **U.S. District Judge**